# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| LARRY D. GREEN, in his individual | ) | |
| capacity and as next friend of ERICA | ) | |
| GREEN, a deceased minor, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10-CV-250-GKF-PJC |
| | ) | |
| HOWARD HENDICK, DIRECTOR OF | ) | |
| THE OKLAHOMA DEPARTMENT OF | ) | |
| HUMAN SERVICES, in his individual and | ) | |
| official capacity; JUSTIN JONES, DIRECTOR | ) | |
| OF OKLAHOMA DEPARTMENT OF | ) | |
| CORRECTIONS, in his individual and | ) | |
| official capacity; HOSPITAL | ) | |
| CORPORATION OF AMERICA d/b/a | ) | |
| OU MEDICAL CENTER, a corporation; | ) | |
| CHIEF EXECUTIVE OFFICER OF THE | ) | |
| HOSPITAL CORPORATION OF | ) | |
| AMERICA d/b/a OU MEDICAL | ) | |
| CENTER, in his individual and official | ) | |
| capacity; COLLEEN MILLER, an | ) | |
| individual; NEVILLE MASSIE, an individual; | ) | |
| CAROL EDWARDS, an individual; | ) | |
| CHERYL MOSELY, an individual; and | ) | |
| John Does 1-9, individuals, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Before the court are Motions to Dismiss Plaintiff's First Amended Complaint filed by

defendants Oklahoma Department of Corrections ("DOC"), Millicent Newton-Embry, Justin

Jones and Neville Massey (collectively "DOC Defendants") [Dkt. #49]; defendants Howard Hendrick and Cheryl Mosely (collectively "DHS Defendants") [Dkt. #67]; and OU Medical Center and Cole C. Eslyn, President and CEO of OU Medical Center (collectively "OU Defendants) [Dkt. #73].[1]

Plaintiff Larry D. Green ("Green") is the natural father of Erica Green, a toddler born in 1997 and murdered by her stepfather and mother in April 2001 in Kansas City, Missouri.  Her remains were discovered on April 28, 2001, but were not identified until 2005.

Green filed this action *pro se* on April 19, 2010. [Dkt. #1].  After the complaint was filed, the court appointed counsel to represent Green.  [Dkt. #5].  With leave of court, Green filed a First Amended Complaint on August 1, 2011. [Dkt. #43].  Green asserts claims for violation of 42 U.S.C. § 1983, wrongful death and negligence.  He seeks actual and punitive damages against all defendants and injunctive relief against the DHS Defendants and the DOC Defendants.

All defendants seek dismissal based on the statute of limitations.  The DHS Defendants and DOC Defendants also contend plaintiff has failed to state a cognizable claim for civil rights violations.  The DHS defendants also seek dismissal on the basis of qualified immunity.  The OU defendants assert they are improper party defendants and the claims against them should be dismissed for failure to file an expert affidavit in compliance with 12 O.S. § 19(A).

### I. Allegations of the First Amended Complaint

Plaintiff, a resident of Muskogee County, Oklahoma, was a resident of Tulsa County, Oklahoma, at the time suit was filed.  [Dkt. #43, ¶1].  He is the biological father of Erica Green,

---

[1] On September 6, 2011, plaintiff filed notices of dismissal of defendant Chris Sekar [Dkt. #54], the Oklahoma Department of Human Services [Dkt. #55], and the Oklahoma Department of Corrections [#56].

who was born on May 15, 1997, and died on April 28, 2001.  [*Id*., ¶2].  He brings this action in his individual capacity and as next friend of Erica Green.  [*Id.,* ¶3].

Hendrick, the DHS director, is sued in his individual capacity in relation to plaintiff's claims for monetary relief and in his official capacity in relation to plaintiff's claim for injunctive relief.  [*Id.,* ¶5].  Cheryl Mosley and John Does 7-9 ("DHS Employees"), current or former employees of DHS, are sued in their individual capacities acting under color of state law in relation to plaintiff's claims for monetary relief and in their official capacities in relation to plaintiff's claim for injunctive relief. [*Id.* ¶6].

Jones, the Director of DOC, is sued in his individual capacity acting under color of state law in relation to plaintiff's claims for monetary relief and in his official capacity in relation to plaintiff's claim for injunctive relief. [*Id.,* ¶9].  The Warden of the Mabel-Bassett Correctional Center is sued in her individual capacity acting under color of state law in relation to plaintiff's claims for monetary relief and in her official capacity in relation to plaintiff's claim for injunctive relief.  [*Id.,* ¶10].  Defendants Neville Massie, Carol Edwards and John Does 4-6 ("DOC Employees"), current or former employees of DOC, are sued in their individual capacities acting under color of state law in relation to plaintiff's claims for monetary relief and in their official capacity in relation to plaintiff's claim for injunctive relief.  [*Id.,* ¶11].

OU Medical Center, a Tennessee Corporation doing business in Oklahoma County, Oklahoma, is the hospital required by statute in Oklahoma to treat inmates in DOC custody.  [*Id.,* ¶13].  Colleen Miller, Linda Rutledge and John Does 1-3 ("OU Employees), current or former employees of OU Medical Center, are sued in their individual capacities acting under color of state law in relation to plaintiff's claims for monetary relief and in their official capacity in relation to plaintiff's claim for injunctive relief.  [*Id.,* ¶14].  The OU CEO is sued in his

individual capacity as the head of an entity acting under color of state law in relation to plaintiff's claims for monetary relief and in his official capacity in relation to plaintiff's claim for injunctive relief.  [*Id.*, ¶15].  OU Medical Center, OU CEO and OU Employees are collectively referred to as the "OUMC Defendants."

Erica Green was born on May 15, 1997.  [*Id.*, ¶18].  Her mother was Michelle Johnson. Plaintiff was her natural father.  [*Id.*].  In March 1997, Michelle Johnson was convicted of Larceny of Merchandise from a retailer Muskogee County District Court.  [*Id.*, ¶19].  At that time, Michelle Johnson had four prior felony convictions for which she was serving suspended sentences.  [*Id.*].  As a result of her 1997 conviction, the state court revoked her prior suspended sentences and sentenced her to two years of custody with the Oklahoma Department of Corrections ("DOC").  [*Id.*].  She began serving her sentence on April 9, 1997.  [*Id.*, ¶20]. Michelle Johnson was eight months pregnant with Erica Green at the time.  [*Id.*, ¶21].  Plaintiff alleges as a result that Erica Green had a constitutionally protected right to life and liberty.  [*Id.*, ¶21].  Pregnant inmates are housed at Mabel Bassett Correctional Center ("Mabel Bassett") in McCloud, Oklahoma.  [*Id.*, ¶19].  Because of her pregnancy, Michelle Johnson was placed at Mabel Bassett.  [*Id.*].

On May 14, 1997, Michelle Johnson was taken by DOC to the OU Medical Center in Oklahoma City to deliver Erica Green. [*Id.*, ¶23].  Erica Green was born on May 15, 1997.  [*Id.*, ¶24].  Plaintiff alleges at the time of her birth, Erica Green was in the custody and control of the DOC Defendants.  [*Id.*].  Shortly after Erica's birth, the DOC Defendants returned Michelle Johnson back to the general population at Mabel Bassett.  [*Id.*, ¶25].  At the time of Erica's birth, plaintiff was also incarcerated with DOC on a felony conviction.  [*Id.*, ¶26].

On May 16, 1997, the DOC Defendants and OU Defendants transferred custody of Erica to Betty Brown, an acquaintance of Michelle Johnson.  [*Id.,* ¶27].  Although Johnson "purported to authorize the transfer of Erica" to Brown, the DOC Defendants and OU Defendants performed no background check on Brown and failed to provide her any guidance or standards as to the care, custody and possible future reunification of Erica with her natural parents.  [*Id.*].  The DOC and OU Defendants signed over custody of Erica to Brown with a one page form, upon Brown showing only a driver's license and a Sam's club card.  [*Id.*].  The form purports to hold harmless the OU Defendants or their agents from any liability for the transfer of the child.  [*Id.*].

On October 23, 1997, Michelle Johnson was released on probation from DOC custody.  [*Id.,* ¶28].  The DOC Defendants failed to notify DHS or Brown of Michelle Johnson's release.  [*Id.*].  Shortly thereafter, and unsupervised by the DOC or DHS Defendants, Michelle Johnson began sporadically visiting Erica.  [*Id.,* ¶29].  In April 2001, Harrell Johnson, Michelle Johnson's boyfriend (and later husband), and Michelle Johnson picked Erica up from Brown and took her to Kansas City, Missouri.  [*Id.,* ¶30].

Once in Kansas City, high on drugs, Harrell Johnson kicked Erica in the side of the face, which resulted in her death.  [*Id.,* ¶31].  Harrell Johnson and Michelle Johnson did not seek medical treatment for Erica because they had outstanding warrants for their arrest.  [*Id.,* ¶32].  After Erica died, Michelle Johnson and Harrell Johnson took her body to a wooded area in Kansas City, undressed Erica's body, and decapitated her using hedge clippers.  [*Id.,* ¶33].  They disposed of her head and body in the woods.  [*Id.*].

Erica's body was discovered on April 28, 2001.  [*Id.,* ¶34].  Despite the best efforts of law enforcement and the community at large, Erica Green's body remained unidentified for more

than four years.  [*Id.,* ¶35].  During this time, Erica Green became known as "Precious Doe."

[*Id.*].  In May 2005, Erica Green's body was identified.  [*Id.,* ¶36].

### DHS Defendants

Prior to her pregnancy with Erica Green, Michelle Johnson had a long history of

involvement with child welfare agencies in Illinois and Oklahoma.  [*Id.,* ¶37].  In Illinois, the

child protective services found two confirmed reports of child abuse/neglect, and in 1992, the

State of Illinois found Michelle had failed to protect two of her children from physical abuse.

[*Id.,* ¶38].  In 1993, the State of Illinois confirmed Michelle gave birth to a child testing positive

for cocaine.  [*Id.*].  The three children in Illinois were no longer in Michelle Johnson's custody

prior to Erica Green's birth.  [*Id.*].  Plaintiff alleges that prior to Erica's birth, the DHS

Defendants "knew or should have known of Michelle Johnson's prior involvement with Illinois

child protective services."  [*Id.,* ¶39].

In 1995, after Michelle Johnson moved to Oklahoma, DHS was notified that she gave

birth to another child ("LGJ") who tested positive for cocaine.  [*Id.,* ¶40].  Plaintiff Larry Green

was the biological father of LGJ.  [*Id.*].  LGJ was the subject of numerous referrals to DHS and,

at one point prior to Erica Green's birth, DHS removed LGJ temporarily from Michelle

Johnson's custody while Michelle sought treatment for her drug issues.  [*Id.*].  In late January

and early February of 1997, DHS began investigating allegations that Michelle Johnson was

endangering LGJ.  [*Id.,* ¶41].  During the DHS investigation, DHS employees noted that

Michelle Johnson was pregnant (with Erica Green) and still using drugs.  [*Id.*].  While Michelle

was pregnant with Erica, DHS Defendants were also aware that she had been convicted for

shoplifting, had a lengthy prior criminal record and would be incarcerated at DOC.  [*Id.,* ¶42].

Plaintiff alleges the DHS Defendants, as a result of their investigation regarding LGJ, "knew or

should have known that Larry Green was incarcerated and/or unable to care for Erica Green" and therefore DHS "knew or should have known that Erica Green fit the very definition of a deprived child under Oklahoma State Statues because both parents were in DOC custody and unable to care for their child and no guardianship was in place."  [*Id.*, ¶43].

After Michelle Johnson was released from DOC custody and before the murder of Erica Green, the State of Oklahoma, based on DHS's recommendations, terminated her parental rights with respect to LGJ due to abuse, neglect and/or abandonment.  [*Id.*, ¶44].  Further, after Michelle Johnson was released from prison and prior to her participation in Erica Green's murder, DHS received at least one referral that Michelle was using drugs and subjecting Erica Green to child abuse and/or neglect.  [*Id.*, ¶45].  DHS found the allegation to be unsubstantiated and did not remove Erica from the custody of her mother, who—plaintiff contends—was unfit at that time.  [*Id.*, ¶45].

Plaintiff alleges that, as a result of the foregoing, at the time Michelle Johnson became incarcerated in April 1997, DHS Defendants knew or should have known Michelle Johnson had a long history of drug abuse and at least four prior felony convictions; she had a history of allegations of child abuse and neglect with four of her other children; she was being investigated for child neglect and/or abuse for LGJ; she was convicted for shoplifting; she would enter DOC custody while being late-term pregnant with Erica Green; Larry Green, Erica's father, was also incarcerated and/or unable to care for Erica while Michelle Johnson was incarcerated; and, therefore, that Erica Green would soon be born a deprived child under 10 O.S. § 7001-1.3(10) (1998) (renumbered s 10A O.S. § 1-1-105(20)). [*Id.*, ¶46].  Additionally, after Michelle Johnson's release from DOC custody, the DHS Defendants knew or should have known that a state court had terminated her parental rights for LGJ based on DHS's own investigation and she

had been investigated by DHS for drug use and child abuse, abandonment, and/or neglect of

Erica Green. [*Id.,* ¶47].

Plaintiff alleges that despite this knowledge, the DHS Defendants "deliberately failed to

take any reasonable steps, or to exercise any reasonable professional judgment" to protect Erica

from harm, including (without limitation):

(i)  failing to adopt any policies or procedures to monitor and protect children like Erica who DHS knows will be born to incarcerated women, including instituting a simple practice of communication and notice between DHS and DOC regarding incarcerated pregnant women who are likely to give birth while incarcerated,

(ii)  failing to perform any oversight, monitoring, or diligence with respect to the transfer of custody from the DOC and OU Defendants to Brown,

(iii)  failing to provide any policies, guidelines or standards to govern Erica's care, custody or permanency planning—including potential reunification while her parents were incarcerated,

(iv)  allowing Michelle [Johnson] after she was released from DOC, to take custody of Erica when Michelle [Johnson] was clearly unfit to care for Erica,

(v)  failing to reasonably and properly investigate allegations of child abuse and neglect of Erica committed by Michelle Johnson after she was released from prison; and

(vi)  failing to remove Erica from the custody of Michelle Johnson after she was released from prison and before she participated in Erica's brutal murder.

[*Id.,* ¶48].

Plaintiff alleges that "[a]s a natural and probable consequence of DHS Defendants'

failures, Michelle Johnson and Harrell Johnson took Erica to Kansas City and murdered her."

[*Id.,* ¶49].  Additionally, following Erica Green's death, DHS continued collecting child support

from Larry Green for Erica Green's care and to date has not returned the wrongfully collected

funds.  [*Id.,* ¶50].

**DOC Defendants**

Plaintiff alleges that when Erica was born to a mother in DOC custody, Erica herself was in DOC custody and, pursuant to the Due Process Clause of the Fourteenth Amendment, the DOC Defendants had a constitutionally mandated duty to take reasonable steps to prevent harm to Erica.  [*Id., ¶¶*51-52].  He contends the DOC Defendants failed in that duty by:

   a.  Failing to adopt and implement policies or procedures regarding the transfer of custody of children born to incarcerated mothers; instead the decision regarding custody of Erica was left solely to the incarcerated, unfit mother, Michelle Johnson, "who was acting under the duress of incarceration."

   b.  Failing to notify DHS that one of DOC's inmates, Michelle Johnson, was giving birth to Erica Green, and signing custody over to a non-kin third-party.  If such notification was made, DHS could and should have taken custody of Erica or otherwise would have conducted a full and proper intake assessment.

   c.  Performing no due diligence, supervision or oversight to determine the fitness of the person to whom custody was transferred or over the transfer process itself;

   d.  Failing to take any steps to advise Brown of any standards or guidelines that were in place for the care and custody of Erica.

[*Id., ¶*53].  Plaintiff alleges that "[a]s a natural and probable result of DOC Defendants' failures, Erica Green was eventually murdered."  [*Id., ¶*54].

**OU Defendants**

Plaintiff alleges the OU Defendants, acting under color of state law, assumed the responsibility of arranging for the transfer of custody of Erica Green from DOC and OU Medical Center to a non-kin third-party.  [*Id., ¶*55].  Therefore, pursuant to the Fourteenth Amendment, the OU Defendants had "a constitutionally mandated duty to prevent harm to Erica Green."  [*Id., ¶*56].  She contends the OU Defendants "held themselves out as having expertise and/or experience in social services as it relates to transferring custody of newborn children from

incarcerated women to non-kin, non foster-care placements."  [*Id.,* ¶57].  He contends the OU

Defendants failed their duty to protect Erica from harm by:

    a.   Failing to notify DHS that an incarcerated woman, Michelle Johnson, was giving
        birth to Erica Green, whom they would be signing custody over to a non-kin third-
        party.  If such notification was made, DHS could and should have taken custody of
        Erica or otherwise would have conducted a full and proper intake assessment.

    b.   Performing no reasonable social work or ordinary diligence to determine the fitness
        of the person to whom custody was transferred.

    c.   Failing to adopt or implement any reasonable policies or practices to monitor the care,
        custody or parental reunification of Erica Green.

[*Id.,* ¶58].   Plaintiff also alleges the OU Defendants failed to perform any oversight or provide

any standards or guidance with respect to the care, custody and/or parental reuinification of Erica

after OU Defendants transferred custody of Erica.  [*Id.,* ¶59].  He contends that "[a]s a natural

probable consequence of OU Defendants' failures, Erica Green was eventually murdered." [*Id.*,

¶60].

### Plaintiff's Discovery of Factual Bases for Claims

Plaintiff alleges:

  At the time of Erica Green's birth, death, and at various times subsequent thereto
(including when Erica's body remained unidentified), Plaintiff was incarcerated in DOC
custody, and, therefore, was unable, with the exercise of reasonable diligence, to discover
the factual basis for any claims that he, individually or as next of kin, might have against
all of the Defendants named herein, until late 2010 at the earliest.

[*Id.,* ¶61].

### Claims Asserted

Plaintiff asserts the following claims:

**Count I—42 U.S.C. § 1983**—The DHS Defendants had a constitutional duty under the

due process clause of the Fourteenth Amendment not to create a danger which would result in

harm to Erica Green and to otherwise take reasonable steps to protect her from harm.  [*Id.,* ¶62].

The DHS Defendants breached their duties, as described in Paragraph 48, knowingly putting Erica Green at a substantial and obvious risk of harm.  [*Id.,* ¶64].  Plaintiff alleges DHS Defendants' acts and omissions were made with reckless disregard and/or deliberate indifference to Erica Green's and plaintiff's federally protected rights, shock the conscience of the community, and created an obvious and substantial danger to Erica Green and/or increased her vulnerability to danger.  [*Id.,* ¶65].  As a result of the DHS Defendants' acts and omissions, Erica Green's and Larry Green's federally protected rights were violated, and Erica Greene endured physical pain and suffering, mental pain and anguish and death.  [*Id.,* ¶66].   Additionally, plaintiff suffered loss of anticipated services and support, loss of companionship and love of Erica Green and destruction of the parent-child relationship.  [*Id.,* ¶67].

**Count II—42 U.S.C. § 1983—**The DOC Defendants had a constitutional duty under the due process clause of the Fourteenth Amendment to prevent harm to Erica Green the minute she was born in DOC's custody.  [*Id.,* ¶68].  The DOC Defendants deliberately breached their duties, as described in Paragraph 53, with reckless disregard or callous indifference to Erica Green and Larry Green's federally protected rights.  [*Id.,* ¶70].  As a result of the DOC Defendants' acts and omission, Erica Green's and Larry Green's federally protected rights were violated, and Erica Green endured physical pain and suffering, mental pain and anguish and death.  [*Id.,* ¶71].  Additionally, plaintiff suffered loss of anticipated services and support, loss of companionship and love of Erica Green and destruction of the parent-child relationship.  [*Id.,* ¶72].

**Count III—42 U.S.C. § 1983—**The OU Defendants created a special relationship with Erica Green by assuming responsibility of arranging for the transfer of her custody from DOC and the OU Medical Center to a non-kin third-party.  [*Id.,* ¶73].  Therefore, the OU Defendants had a constitutional duty under the Due Process Clause of the Fourteenth Amendment to prevent

harm to Erica Green. [*Id.,* ¶74]. The OU Defendants deliberately breached their duties, as described in Paragraph 58, with reckless disregard or callous indifference to Erica Green's and Larry Green's federally protected rights. [*Id.,* ¶76]. As a result of the OU Defendants' acts and omissions, Erica Green's and Larry Green's federally protected rights were violated, and Erica Green endured physical pain and suffering, mental pain and anguish and death. [*Id.,* ¶77]. Additionally, plaintiff suffered loss of anticipated services and support, loss of companionship and love of Erica Green and destruction of the parent-child relationship. [*Id.,* ¶78].

 **Count IV—Negligence—**The OU Defendants owed a duty to use ordinary care to ensure the safety and well-being of Erica Green, a child born in state custody. [*Id.,* ¶79]. The OU Defendants breached their duty, and that breach was the proximate cause of Erica Green's wrongful death. [*Id.,* ¶80]. The OU Defendants' breach of duty was in bad faith and in reckless disregard of Erica Green's rights and/or was intentional and without cause or excuse, endangering human life. [*Id.,* ¶81]. As a result of the OU Defendants' negligence, Erica Green endured physical pain and suffering, mental pain and anguish and death. [*Id.,* ¶82].

 **Count V—Wrongful Death—**The OU Defendants independently and through their employees owed a duty to use ordinary care to ensure the safety and well-being of Erica Green, a child born in state custody. [*Id.,* ¶83]. The OU Defendants breached their duty and the breach was the proximate cause of Erica Green's wrongful death. [*Id.,* ¶84]. The OU Defendants' breach of duty was in bad faith and in reckless disregard of Erica Green's rights, and/or was intentional and without cause or excuse, endangering human life. [*Id.,* ¶85]. As a result of OU Defendants' negligence, Erica Green was murdered and Larry Green suffered loss of anticipated services and support, loss of companionship and love of Erica Green, and destruction of the parent-child relationship. [*Id.,* ¶86].

**Count VI—Unjust Enrichment—**After Erica Green was murdered, the DHS Defendants continued to collect child support for her care from plaintiff.  [*Id.,* ¶87].  To date, DHS Defendants have not returned any of the funds wrongfully collected.  [*Id.,* ¶88].[2]

**Count VII—Injunctive Relief—**Plaintiff seeks an injunction ordering DOC and DHS to adopt and implement policies and practices to provide for the assessment of custody, transfer of custody, and subsequent placement of newborn children born to women who are incarcerated at DOC consistent with sound child-welfare practices and the best interests, safety and well-being of the newborn child.  [*Id.,* ¶90].

## II. OU Defendants

The First Amended Complaint named Hospital Corporation of America ("HCA"), d/b/a OU Medical Center, as well as the Chief Executive Officer of HCA, and employees of HCA, as defendants.   The complaint asserts claims for § 1983 violations (Count III), negligence (Count IV) and wrongful death (Count V) against the OU Defendants.[3]

Plaintiff alleges the OU Defendants deliberately failed their constitutional duty to prevent harm to Erica Green by failing to notify DHS that an incarcerated woman, Michelle Johnson, was giving birth to Erica Green, whom they would be signing custody over to a non-kin third party; performing no reasonable social work or ordinary diligence to determine the fitness of the

---

[2] Plaintiff previously dismissed DHS altogether from this lawsuit [Dkt. #55], and has conceded the Motion to Dismiss of the remaining DHS Defendants with respect to Count VI (unjust enrichment).  [Dkt. #76 at 4].

[3] Plaintiff has not named the OU Defendants in his claim for injunctive relief (Count VII), and requests "that the Court order DOC and DHS to adopt and implement policies and practices to provide for the assessment of custody, and the transfer of custody, and subsequent placement of newborn children born to women who are incarcerated at DOC consistent with sound child-welfare practices…"  [Dkt. #43 at 18-19].

person to whom custody was transferred; and failing to adopt or implement any reasonable policies or practices to monitor the care, custody or parental reunification of Erica Green.

The OU Defendants assert, as a matter of law, that the University Hospital was owned, operated, managed, supervised or controlled by the State of Oklahoma through the University Hospitals Authority rather than by the OU Defendants at the time Michelle Green gave birth to Erica. Thus, the First Amended Complaint fails to state a claim against the OU Defendants and is subject to dismissal under Fed.R.Civ.P. 12(b)(6).

The University Hospitals Authority Act 63 O.S. § 3201 *et seq.*, created a University Hospitals Authority as a state agency to run the Oklahoma Memorial Hospital, the Children's Hospital of Oklahoma, the Child Study Center and the O'Donoghue Rehabilitation Institute ("University Hospitals"). Under the act, University Hospitals were under the jurisdiction, supervision, management and control of the Department of Human Services and the Commission for Human Services until July 1, 1993. 63 O.S. § 3204(A). The University Hospitals were transferred from DHS and the Commission for Human Services to the University Hospitals Authority effective July 1, 1993. 63 O.S. § 3204(B). The Act stated:

> A. Contingent upon the creation of the University Hospitals Trust as provided in Section 3224 of this title, the Trust, prior to acceptance, shall submit to the Contingency Review Board for review the proposed agreement regarding the lease and operations of the University Hospitals to any entity authorized to transact business in the state and an independent statement as to the fairness of said proposed agreement for the State of Oklahoma. The Contingency Review Board shall upon receipt of the proposed agreement meet within fifteen (15) business days to review the proposed agreement; and unless the Contingency Review Board disapproves the proposed agreement, the proposed agreement may be executed, but *no lease of the University Hospitals shall become effective until after Supreme Court approval pursuant to subsection B of this section.*

63 O.S. § 3225(A) (emphasis added).  Thus, before any proposed agreement regarding the lease and operations of the University Hospitals could become effective, approval by both the Contingency Review Board and the Oklahoma Supreme Court is required.

In a published opinion dated December 30, 1997, the Oklahoma Supreme Court approved a proposed agreement between the University Hospital Authority, the University Hospitals Trust, the Board of Regents of the University of Oklahoma and HCA Health Services of Oklahoma, d/b/a Presbyterian Hospitals. *See In re University Hospitals Authority,* 953 P.2d 314 (1997). Under the agreement—which had been approved by the Contingency Review Board—the Authority agreed to a long term lease and transfer of the University Hospitals properties and other non-cash assets from the Authority to the Trust.  *Id.* at 318.  The Trust agreed to sublease and contract to transfer to HCA the rights to use those assets and operate the Hospitals.  *Id.* HCA was to be responsible for day-to-day management and operation of the Hospitals. The Supreme Court concluded:

> Based on the record before us, the proposed agreement is not in discord with the University Hospitals Authority Act and Oklahoma laws.  Because of this conclusion, The parties to the Transaction may proceed as directed by the Act.

*Id.* at 321.  Thus, on December 30, 1997, the Oklahoma Supreme Court, for the first time, allowed the University Hospital Authority to contract and lease the operations of the University Hospital to HCA Health Services of Oklahoma.

As permitted under Fed.R.Evid. 201, the court takes judicial notice of *In re University Hospitals Authority.*  Erica Green was born at University Hospital on May15, 1997.  At the time of her birth, the OU Defendants did not own, operate, manage, supervise or control University Hospital.

Plaintiff asserts the OU Defendants must remain in the lawsuit even if the claims against it for monetary damages are dismissed, because plaintiff has requested prospective injunctive relief.  However, the OU Defendants are not named in Count VII of plaintiff's First Amended Complaint.  Only the DHS Defendants and DOC Defendants are named.

The court concludes the OU Defendants are not proper party defendants and are entitled to dismissal of plaintiff's claims against them.

### III. Statute of Limitations

The DHS Defendants and DOC Defendants assert plaintiff's claims are barred by the statute of limitations.

The statute of limitations period for a § 1983 claim is dictated by the personal injury statute of limitations in the state in which the claim arose.  *McCarty v. Gilchrist,* 626 F.3d 1281, 1289 (10th Cir. 2011) (citing *Wallace v. Kato,* 549 U.S. 384, 387 (2007).  In Oklahoma, that period is two years.  *Id.* (citing 12 O.S. § 95(A)(3)).  Federal law, however, governs when the action accrues.  *Id.* In general, under the federal discovery rule, claims accrue and the statute of limitations begins to run when the plaintiff "knows or has reason to know of the existence and cause of the injury which is the basis of his action."  *Alexander v. Okla.,* 382 F.3d 1206, 1215 (10th Cir. 2004). "In particular, [a] civil rights action accrues when facts that would support a cause of action are or should be apparent."  *Id.* (quotation and citation omitted).  A claimant need not "know all of the evidence ultimately relied on for the cause of action to accrue."  *Id.* at 1216. Rather, the court must focus on "whether the plaintiff knew of facts that would put a reasonable person on notice that wrongful conduct caused the harm."  *Id.*

Plaintiff alleges he was incarcerated at the time of Erica Green's birth, death and at various times subsequent thereto (including when Erica's body remained unidentified) and

therefore was unable, with the exercise of reasonable diligence to discover the factual basis for any claims that he, individually or as next of kin, might have against the defendants until late 2010.  [Dkt. #43, ¶61].  Defendants contend plaintiff's claims are—on the face of the complaint—time barred, since the First Amended Complaint states Erica Green's body was identified in May 2005, and the newspaper article referred to in the complaint was written in October 2008, and discusses testimony at Harrell Johnson's criminal trial.  Citing *Ames v. Oklahoma,* 158 Fed. Appx. 114 (10th Cir. 2005) and *Bowman v. County of Oklahoma,* 5 F3d. 545 (10th Cir. 1993), the DOC Defendants assert "[p]laintiff's claim of legal disability due to incarceration are insufficient to justify tolling."  [Dkt. #60 at 2].[4]

Plaintiff, though, has not asserted a claim of legal disability under 12 O.S. § 96.  Rather, he contends "[a]t the time of Erica Green's birth, death, and at various times subsequent thereto (including when Erica's body remained unidentified), Plaintiff was incarcerated in DOC custody, and, therefore, was unable, with the exercise of reasonable diligence, to discover the factual basis" for his claim.  Plaintiff's claim may be vulnerable to a motion for summary judgment based on the statute of limitations issue.  However, taking as true the allegations of the complaint—as required at this stage—the court finds plaintiff has alleged adequate facts to withstand the motion to dismiss based on statute of limitations.

---

[4] In *Ames,* the Tenth Circuit acknowledged that Oklahoma law provides a statutory tolling period for persons who are "under any legal disability," and that the statute does not define the term "legal disability" 158 Fed. Appx. at 117 (citing 12 O.S. § 96).  Further, it observed that the Oklahoma Supreme Court has never squarely addressed the prisoner-tolling issue.  *Id.*  It predicted, however, that the Oklahoma Supreme Court would not find incarceration to be a "legal disability."

## IV. Failure to State a Claim for Civil Right Violations

### A. Applicable Standard

Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that a complaint must

contain "a short and plain statement of the claim showing that the pleader is entitled to relief."

The United States Supreme Court clarified this standard in *Bell Atlantic Corp. v. Twombly*, 550

U.S. 544, 570 (2007), ruling that to withstand a motion to dismiss, a complaint must contain

enough allegations of fact "to state a claim to relief that is plausible on its face." 550 U.S. 544,

570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw a reasonable inference that the defendant is liable for the misconduct alleged."

*Id.* at 556.  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to

relief requires more than labels and conclusions, and a formulaic recitation of the  elements of a

cause of action will not do."  *Id.* at 555 (internal quotations omitted).   On a motion to dismiss,

courts "are not bound to accept as true a legal conclusion couched as a factual allegation."  *Id.*

Under the *Twombly* standard, "the complaint must give the court reason to believe that *this*

plaintiff has a reasonable likelihood of mustering factual support for *these* claims."  *Robbins v.*

*Oklahoma,*  519 F.3d 1242, 1247 (10th Cir. 2008), quoting *Ridge at Red Hawk, L.L.C. v.*

*Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original).  "The burden is on the

plaintiff to frame a complaint with enough factual matter (taken as true) to suggest that he or she

is entitled to relief." *Robbins*, 519 F.3d at 1247, citing *Twombly*, 127 S.Ct. at 1965 (internal

quotations omitted).  "Factual allegations must be enough to raise a right to relief above the

speculative level."  *Id.*

Although the new *Twombly* standard is "less than pellucid," the Tenth Circuit Court of Appeals has interpreted it as a middle ground between "heightened fact pleading," which is expressly rejected, and complaints that are no more than "labels and conclusions," which courts should not allow. *Robbins*, 519 F.3d at 1247, citing *Twombly*, 127 S.Ct. at 1964, 1965, 1974. Accepting the allegations as true, they must establish that the plaintiff plausibly, and not just speculatively, has a claim for relief. *Robbins*, 519 F.3d at 1247. "This requirement of plausibility serves not only to weed out claims that do not (in the absence of additional allegations) have a reasonable prospect of success, but also to inform the defendants of the actual grounds of the claim against them." *Id*. at 1248. The Tenth Circuit Court of Appeals instructed in *Robbins* that "the degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context. . . .[and] the type of case." *Id*. (citing *Phillips v. County of Allegheny*, 515 F.3d 224, 231-32 (3d Cir. 2008)). A simple negligence action may require significantly less allegations to state a claim under Rule 8 than a case alleging anti-trust violations (as in *Twombly*) or constitutional violations (as in *Robbins*). *Id*.

## B. Analysis

### 1. § 1983 Claim Against DHS Defendants

#### a. Whether the Complaint States a Cognizable Constitutional Right

Citing *Brown v. Commonwealth of Pennsylvania, Dept. of Health Emergency Medical Service Training Institute,* 318 F.3d 473 (3rd Cir. 2003), the DHS Defendants argue the Due Process Clause of the Fourteenth Amendment does not require a state to provide citizens with protective services, nor does it convert alleged acts of negligence into federal torts.

Plaintiff, however, asserts the DHS Defendants are liable under a danger creation theory.

State officials can be held liable for the acts of third parties where those officials "created the danger" that caused the harm. *Christiansen v. City of Tulsa,* 332 F.3d 1270, 1279 (10th Cir. 2003). To establish a claim for danger creation, the plaintiff must demonstrate (1) the charged stated entity and/or individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendants' conduct put plaintiff at substantial risk of serious, immediate and proximate harm; (5) defendants acted recklessly in conscious disregard of the risk; and (6) such conduct, when viewed in total, is conscience shocking. *Id.* citing *Gonzales v. City of Castle Rock,* 307 F.3d 1258, 1263 (10th Cir. 2002). In considering the required scienter, courts focus on the deliberateness of the conduct at issue. *Christiansen,* 332 F.3d at 1279. The Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct." *Uhlrig v. Harder,* 64 F.3d 567, 573 (10th Cir. 1995). Thus, § 1983 liability will not lie absent (1) "an intent to harm" or (2) "an intent to place a person unreasonably at risk of harm." *Id.* The latter requires that "the defendant recognize[] the unreasonable risk and actually intend[] to expose the plaintiff to such risks without regard to the consequences to the plaintiff." *Id.* at 573, n. 8.

Plaintiff alleges the DHS Defendants breached their duties by failing to adopt any policies or procedures to monitor  and protect children who DHS knows will be born to incarcerated women, including communication and notice between DHS and DOC regarding incarcerated pregnant women who are likely to give birth while incarcerated; failed to provide any oversight, monitoring or diligence with respect to the transfer of custody from the DOC and OU Defendants to Brown; failed to provide policies, guidelines or standards to govern Erica's care, custody or permanency planning while her parents were incarcerated; allowed Michelle

Green, after she was released from DOC, to take custody of Erica when Michelle Green was clearly unfit to care for Erica; failed to reasonably and properly investigate allegations of child abuse and neglect of Erica committed by Michelle Johnson after she was released from prison; and failed to remove Erica from her custody after she was released from prison and before she participated in Erica's murder.

The First Amended Complaint alleges that before Erica Green's birth, Michelle Green had a long history of drug abuse and at least four prior felony convictions and a long history of allegations of child abuse and neglect with four of her other children. In fact, prior to Erica's birth, Michelle no longer had custody of three of her children. The complaint alleges DHS employees investigated Michelle for child neglect and/or abuse of one of her other children while she was pregnant with Erica. During the investigation, DHS employees learned Michelle was pregnant with Erica, had been using drugs during the pregnancy and was being incarcerated in prison on a conviction for shoplifiting. Thus, DHS employees knew Michelle would enter DOC custody while being late-term pregnant with Erica and that plaintiff, Erica's father, was also incarcerated and/or unable to care for Erica while Michelle was incarcerated, and Erica would be born a deprived child under Oklahoma law. The complaint alleges that after Erica's birth and prior to her death, DHS employees knew that a state court had terminated Michelle's parental rights for another child *based on DHS's own recommendation*, and Michelle had been investigated *by DHS* for drug use and child abuse, abandonment and/or neglect of Erica. The complaint alleges that despite the knowledge of the risk of imminent harm posed to Erica and knowing that Erica was going to be a deprived child at birth under Oklahoma law, DHS employees deliberately took no action to establish policies or oversee Erica's transfer to a foster parent, to protect her from Michelle, or to remove her from Michelle's custody.

The court concludes, applying the standard set forth in *Christiansen* and *Uhlrig,* that the complaint alleges facts sufficient to give the court reason to believe plaintiff has a reasonable likelihood of mustering factual support for all elements of a  § 1983 claim against the DHS Defendants under a "danger creation" theory, including the requirement that defendants' conduct, when viewed in total, is conscience shocking.  *See Currier v. Doran,* 242 F.3d  905, 918 (10th Cir. 2001); *Taylor v. Oklahoma ex rel. Depart. Human Services,* No. 07-CV-380-GKF-PJC, 2008 WL 268333 (N.D. Okla. Jan. 29, 2008).  The court rejects DHS Defendants' argument that plaintiff has failed to state a claim for a civil rights violation.

### b.  Qualified Immunity

The DHS defendants also contend they are entitled to qualified immunity from liability on plaintiff's § 1983 claim. Qualified immunity protects government officials from individual liability in a §1983 action unless the officials violated clearly established constitutional rights. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  When a defendant pleads qualified immunity, the plaintiff must make a two-part showing: "First, the plaintiff must demonstrate that the defendant's actions violated a constitutional or statutory right."  *Albright v. Rodriguez,* 51 F.3d 1531, 1534 (10th Cir. 1995).  "Second, the plaintiff must show that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue."  *Id.*

The court has already determined the factual allegations of the complaint satisfy the first part of the showing—i.e., that defendants' actions violated a constitutional right.

With respect to the second part, a constitutional right is "clearly established" if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton,* 483 U.S. 635, 640 (1987).  "This is not

to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Id.* If a plaintiff is unable to demonstrate that the law allegedly violated was clearly established, the plaintiff is not allowed to proceed with the suit. *Medina v. City and County of Denver,* 960 F.2d 1493, 1497 (10th Cir. 1992). Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains. *Id.* at 1498.

In *Currier,* decided in 2001, the court discussed at length the history of danger creation jurisprudence in the Tenth Circuit and elsewhere. The court observed that in *DeShaney v. Winnebago County Dep't of Social Services,* 489 U.S. 189 (1989), the Supreme Court held that state officials could not be liable for failing to protect citizens from private violence, but noted the state had played no part in creating the danger or leaving the plaintiff more vulnerable to the danger. 242 F.3d at 923. The Tenth Circuit court stated:

> The clear implication of the Court's language, which was written in 1989, was that a state could be liable when it affirmatively acts to create, or increases a plaintiff's vulnerability to, danger form private violence. Any doubts as to the possible inference to be drawn in this circuit from the Court's language in *DeShaney* were dispelled by the *Medina* case. In *Medina,* decided in 1992, the court contrasted the social workers in *DeShaney* with police officers who recklessly chased a suspect, noting that the police officers "affirmatively and directly changed the status quo … by pursuing an allegedly unconstitutional chase. *DeShaney* is therefore inapplicable.

*Id.* The court concluded:

> "Based on *DeShaney, Medina*, and the ample case law from other circuits, this court concludes that a reasonable state official would have known in 1993 and 1994 that reckless, conscience shocking conduct that altered the status quo and placed a child at substantial risk of serious, immediate, and proximate harm was unconstitutional." *Id.* at 924.

Similarly, this court concludes the DHS Defendants, at all times relevant to the events giving rise to plaintiff's § 1983 claim against them, would or should reasonably have known the alleged conduct was unconstitutional. The court rejects DHS Defendants' claim of qualified immunity at this stage of the proceeding.

### 2. § 1983 Claim Against DOC Defendants

Plaintiff's First Amended Complaint, on its face, asserts § 1983 claims for monetary relief against the DOC Defendants in their individual capacities. [Dkt. #43 at ¶¶9-11]. When state officials are sued in their individual capacities, the state officials are not immune from suit and are considered "persons" for purposes of § 1983. *See Hafer v. Melo,* 502 U.S. 21, 26-28 (1991).

The DOC Defendants, relying on *Will v. Michigan Dep't of State Police,* 491 U.S. 58 (1989), argue that since the claims partially revolve around their alleged failure to implement policies, they are claims against defendants in their "official capacities," and, as such, are barred by Eleventh Amendment immunity. A similar claim of immunity was addressed—and rejected—in *Hafer.* ("[O]ur cases do not extend absolute immunity to all officers who engage in necessary official acts.") *Id.* at 28.[5]  *See also Hull v. State of N.M. Tax. & Rev. Dep't,* 179 Fed. Appx. 445, 446-47 (10th Cir. 2006) (unpublished) ("state actors can be deemed 'persons' under § 1983 when sued in their *individual* capacities for damages arising from their official acts"). The court rejects the DOC Defendants' argument that the "official capacity" claims are barred by Eleventh Amendment immunity.

---

[5] The court in *Hafer* explicitly held that to the extent its opinion in *Will* created any ambiguity concerning whether state officials could be sued in their individual capacities for acts taken in their official capacity, "we now eliminate that ambiguity." 502 U.S. at 26-27.

The DOC Defendants also assert plaintiff has failed to adequately plead personal participation by each defendant and/or supervisory liability.

The First Amended Complaint alleges Erica was born to a mother in DOC custody, Erica herself was in DOC custody and, pursuant to the Due Process Clause of the Fourteenth amendment, the DOC Defendants had a constitutionally mandated duty to take reasonable steps to prevent harm to Erica.  Children in the custody of the state have a constitutional right to be reasonably safe from harm.  *Yvonne L. v. N.M. Dept. of Human Services,* 959 F.2d 883, 891-93 (10th Cir. 1992).  The complaint also alleges *all* DOC Defendants failed their duty by (1) failing to adopt and implement policies or procedures regarding the transfer of custody of children born to incarcerated mothers; (2) failing to notify DHS that DOC inmate Michelle Green was giving birth to Erica and signed custody over to a non-kin third-party; and (3) by performing no due diligence, supervision or oversight to determine the fitness of the person to whom custody was transferred.  The complaint alleges all DOC Defendants acted with deliberate indifference to Erica's right to be free from harm and ultimately resulted in constitutional harm to Erica.

Plaintiff's first allegation appears to be a claim for supervisory liability.  In order to maintain a claim of supervisory liability under 42 U.S.C. § 1983, a plaintiff must allege sufficient facts to show that he may plausibly establish (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation."  *Dodds. v. Richardson,* 614 F.3d 1185, 1199 (10th Cir. 2010).  The Tenth Circuit has defined "'an intent to place a person unreasonably at risk' (or reckless conduct) as when a state actor 'was aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in conscious

and unreasonable disregard of the consequences.'" *Uhlrig,* 64 F.3d at 574.  Accepting, as it must,

the truth of these allegations, the court finds the allegations plausibly establish a claim for

supervisory liability against Jones, as Director of the DOC, and the Warden of the Mabel Bassett

Correctional Center.  The complaint fails to allege any facts establishing the remaining DOC

Defendants—Massie, Edwards and John Does 1-6—had any supervisory responsibility.

The remaining two allegations—that the DOC Defendants failed to notify DHS that

Michelle Green had given birth to Erica in DOC custody and given custody of her to a non-kin

third party, and failed to perform due diligence regarding the non-kin third party—plausibly

establish cognizable claims against all DOC Defendants at this stage of the proceeding.

### V. Claim for Injunctive Relief

The DOC Defendants assert plaintiff's claim for injunctive relief must be dismissed

because, on the face of the complaint, plaintiff has failed to allege facts supporting a claim for a

permanent injunction.

Plaintiff seeks an injunction requiring "DOC and DHS to adopt and implement policies

and practices to provide for the assessment of custody, and the transfer of custody, and

subsequent placement of newborn children brown to women who are incarcerated at DOC."

For a party to obtain a permanent injunction, he must establish (1) actual success on the

merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs

the harm that the injunction may cause the opposing party and (4) the injunction, if issued, will

not adversely affect the public interest.  *Southwest Stainless, LP v. Sappington,* 582 F.3d 1176,

1191 (10th Cir. 2009).

Tragically, plaintiff's daughter is dead.  Thus, entry of the requested injunction would not prevent irreparable harm to her, and plaintiff has asserted no facts establishing he has standing to sue on behalf of any other children in DOC and/or DHS custody.

Therefore, plaintiff's claim for injunctive relief (Count VII) must be dismissed.

## VI. Conclusion

For the foregoing reasons, the OU Defendants' Motion to Dismiss [Dkt. #73] is granted and Counts III, IV and V are dismissed.

The DHS Defendants' Motion to Dismiss [Dkt. #67] is granted with respect to Count VI (unjust enrichment). The motion is denied in all other respects.

The DOC Defendants' Motion to Dismiss [Dkt. #49] is granted with respect to Count VII, which is dismissed in its entirety, and denied in all other respects.

ENTERED this 19th day of April, 2012.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT